UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

KIM FOREMAN,

            Plaintiff,

            v.

MASTERBRAND CABINETS, INC.,

            Defendant.

)
)
)
)
)
)
)
)
)

CAUSE NO. 3:06-cv-449-MHT

## DEFENDANT'S SUPPLEMENTAL BRIEF
## IN SUPPORT OF ITS RULE 50(a) MOTION

Supplementing it brief concerning punitive damages, Defendant, MasterBrand Cabinets, Inc. ("MBCI") respectfully submits this brief in further support of its motion for judgment as a matter of law on the entirety of Plaintiff Kim Foreman's Complaint pursuant to Rule 50(a) of the Federal Rule of Civil Procedure ("Rule 50 Motion").

### Ms. Foreman Failed To Offer Any Legally Sufficient
### Evidentiary Basis For Her Sex Or Race Discrimination Claims

Ms. Foreman did not offer any legally sufficient evidence that would allow a reasonable jury to infer that sex or race discrimination motivated the termination of her employment.[1]

---

[1] MBCI previously filed a brief in support of its Rule 50 Motion on Ms. Foreman's punitive damages claims. MBCI now respectfully files this supplemental brief addressing the merits of Ms. Foreman's claims and hereby incorporates its previously filed Rule 50 brief.

A.    **Facts Shown At Trial**

The evidence presented at trial showed the following:

1.    Ms. Foreman

Ms. Foreman was employed as an Assembler in the Assembly Department at MBCI's Auburn facility.  Ms. Foreman's primary duty was expediting parts for cabinetry.  As an expediter, Ms. Foreman was responsible for locating and obtaining replacement parts for missing or damaged components so that cabinet assembly could be completed and the cabinets shipped as a complete kitchen.  The expediting function involves identifying the part or component that needs to be repaired or replaced and working with the other departments in the production cycle to obtain the item so that a cabinet may be fully assembled and sent to the Shipping Department.  Since MBCI builds a kitchen at a time, the expeditor position is important in fulfilling MBCI's commitment to ship kitchens complete and on time.

Ms. Foreman's employment with MBCI was terminated on April 13, 2005, after it was determined that on the previous work day she had abandoned her job duties and responsibilities for an extended period of time and been absent from the Auburn facility without notice and without informing any representative of management.[2]

---

[2]    The evidence further demonstrated that the lack of notice prior to departure would likely have been excused but for the fact that Ms. Foreman provided no legitimate explanation for both the lack of communication while absent from the facility and the six-and-a-half-hour length of her absence.  In other words, the evidence showed that the company may have excused an emergency absence if it had been given some reasonable justification.

On April 12, 2005, Ms. Foreman clocked in for her shift at 7:00 a.m.  Her Team Leader and direct supervisor was Mr. Buddy Smith.  Mr. Smith, like Ms. Foreman, is African-American.

Less than two hours after she clocked in, Ms. Foreman, at 8:54 a.m., abandoned her job duties and clocked out.[3]  Ms. Foreman did not advise Mr. Smith that she was leaving work or leaving the facility.  Ms. Foreman also did not advise or seek to advise any other supervisor or any member of MBCI's management team that she was leaving her job assignment and leaving the Auburn facility.  In fact, Ms. Foreman did not advise anyone prior to leaving the facility.

Each morning at 11 a.m., there is a meeting of operations management to assess production and completion rates and make plans for the rest of the day based on that information.  As an expeditor, one of Ms. Foreman's duties was to provide information for this daily meeting concerning completion rates.  On the morning of April 12, 2005, when the supervisors met, Ms. Foreman failed to provide her information needed for the meeting.  Attendees at this meeting included Anthony Zellars, Norm Krogh, and Buddy Smith.  Mr. Zellars was the General Manager and the highest ranking manager within the facility.  Mr. Zellars, like Ms. Foreman, is African-American.  Mr. Krogh was the Senior Manufacturing Manager and responsible for manufacturing operations.  After Ms. Foreman failed to appear for the morning meeting, Mr. Zellars, Mr. Krogh, and Mr. Smith spent time looking for her throughout the plant to determine

---

[3]    MBCI's time clock rounds to the nearest tenth of an hour.  Ms. Foreman's actual punch time for her departure was 8:59 a.m.

whether she might be ill or injured. Eventually it was determined by Mr. Smith and Mr. Krogh that Ms. Foreman had left the facility.

More than six hours later, at 3:36 p.m., Ms. Foreman returned to the facility and clocked back in to work. During the six-and-a-half hours of her absence from the plant, Ms. Foreman had not communicated with any member of MBCI management or anyone in MBCI's administrative or human resources offices to provide notice of her departure from her job. In addition, when she returned to the facility, Ms. Foreman did not bring with her a doctor's note indicating that she had experienced a medical emergency.

After Mr. Smith and Mr. Krogh became aware of Ms. Foreman's reappearance in the facility, Mr. Krogh informed her that she would need to report to human resources the next morning. Ms. Foreman admitted that she had left the facility without informing Mr. Smith or any MBCI supervisor or member of management. Ms. Foreman was placed on suspension pending the outcome of MBCI's investigation of her extended, unauthorized absence from her job and the facility.

Mr. Krogh and/or Mr. Smith consulted with Human Resources Manager Tom Barthel regarding Ms. Foreman's reappearance at work. Mr. Barthel indicated he would find out more about the circumstances of her extended absence.

The next morning, on April 13, 2005, Ms. Foreman met with Mr. Barthel. Ms. Dot Humphries, another MBCI supervisor, sat in on the conference as a witness. Ms. Foreman indicated during her conversation with Mr. Barthel that on the day before, she had left her job and the facility without informing her supervisor and that she had been

4

missing from the facility for the better part of the workday.  Ms. Foreman also indicated that the reason for her departure was that, due to menstruation, she had soiled her clothing and had needed to go home to change her clothes.  Ms. Foreman indicated that she had not spoken with anyone at the plant by telephone during her six-and-a-half-hour absence to give notice that she had had to leave the job.

After their discussion, Mr. Barthel informed Ms. Foreman that her employment was terminated because she had left the plant without notifying any member of management, was gone without any valid reason for the excessive amount of time missed, had a handbook and had reviewed the appropriate policies at the time of her hire, and should have been aware of the consequences of her action.

Mr. Smith, Mr. Krogh, Mr. Barthel, and Mr. Zellars all concurred that termination of Ms. Foreman's employment was warranted under the circumstances.

The day after her employment was terminated, Ms. Foreman spoke with Mr. Zellars about the matter.  Mr. Zellars, as the plant's General Manager, had authority to reverse Ms. Foreman's termination.  Mr. Zellars told Ms. Foreman that he would investigate the matter.  Mr. Zellars then visited the production floor, and after asking every employee working in Ms. Foreman's area, he was not able to find any employee who said that he or she had been told by Ms. Foreman that she was leaving work on April 12 or that he or she had received a telephone call from Ms. Foreman while she was gone giving notice of her departure.  Mr. Zellars therefore concluded Ms. Foreman's termination was justified and did not reverse the decision.

5

2.    DuWayne Nazworth

DuWayne Nazworth is employed in a production position at MBCI.  On September 24, 2004, while working, Nazworth determined that he had blood in his ear. He told his supervisor that he was leaving work for personal reasons.  When his supervisor asked him why he was leaving, Mr. Nazworth responded that it was none of his business and left.

Mr. Nazworth left the plant and received treatment from a doctor for the blood in his ear.  Mr. Nazworth returned to work the next day, bringing with him a note from his doctor excusing his absence from work due to his medical condition.  Mr. Nazworth was not disciplined.

3.    Thomas "Mike" Clack

Thomas "Mike" Clack was employed by MBCI on the DMR crew.  The DMR crew is a skeletal crew that stays late after a shift has been completed and the production lines have been shut down and cleans up after the other production employees had left.  Mr. Krogh had instructed Mr. Clack that before he left at the end of the day, he should tell his supervisor.

On May 16, 2005, Mr. Clack worked a shift that was 11.4 hours long. After completing his DMR work, Mr. Clack left for the day, neglecting to tell his supervisor.  At the time he left the plant, the shift had been completed, the production lines had been shut down, and he had finished his job.  Because Mr. Clack had failed to tell his supervisor before leaving, Mr. Clack was demoted from the DMR position, receiving a cut in his pay.

6

B.     **Legal Standards**

    1.    Ms. Foreman's Discrimination Claims

To support a disparate treatment claim under Title VII for improper termination, a plaintiff "must prove that the defendant acted with discriminatory purpose." *Williams v. Motorola, Inc.*, 303 F.3d 1284, 1293 (11th Cir. 2002). Where a plaintiff lacks direct evidence of discrimination, she "must create an inference of discrimination by establishing a prima facie case." *Id.* The Eleventh Circuit has explained that for a plaintiff alleging discriminatory discharge to make out a prima facie case, she must show:

> [1] that she is a member of a protected class, [2] that she was qualified for the job from which she was fired, and [3] ' that the misconduct for which she was discharged was <u>nearly</u> <u>identical</u> <u>to</u> <u>that</u> <u>engaged</u> <u>in</u> <u>by</u> [<u>an</u> <u>employee</u> <u>outside</u> <u>the</u> <u>protected</u> <u>class</u>] <u>whom</u> [<u>the</u> <u>employer</u>] <u>retained.</u>'

*Williams*, 303 F.3d at 1293 (citation omitted; emphasis added).

If a plaintiff succeeds in establishing a prima facie case giving rise to a presumption of discrimination, the defendant must rebut this presumption by producing evidence that the termination was motivated instead by a legitimate, nondiscriminatory reason. *Wright v. Sanders Lead Co.*, 2006 WL 905336, at *6 (M.D. Ala. April 7, 2006). If the defendant is able to meet this burden of production, the plaintiff, in order to prevail, must then present sufficient evidence to demonstrate that the proffered reason is merely a pretext for discrimination.[4] *See Holston v. The Sports Authority*, 136 F. Supp. 2d 1319,

---

[4]  The Supreme Court has observed that, once a defendant has met its burden of production, the "presumption [raised by the showing of a prima facie case], having fulfilled its role of forcing the defendant to come forward with some response, simply drops out of the picture." *St. Mary's Honor*

BDDB01 4876064v1

1325 (N.D. Ga. 2000). Moreover, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Harrison v. United Auto Group,* 492 F.3d 972 (8th Cir. 2007) (plaintiff failed to meet his burden of showing race was the reason he was not hired).

2.    Judgment As A Matter Of Law Under Rule 50(a)

If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may grant a motion for judgment as a matter of law against the party. Fed.R.Civ.P. 50(a).[5] To survive a defendant's motion for judgment as a matter of law, a plaintiff "must put forth more than a mere scintilla of evidence suggesting that 'reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions.'" *Pickett v. Tyson Fresh Meats, Inc.*, 315 F.Supp.2d 1172, 1175 (M.D. Ala. Apr. 23, 2004) quoting *Thosteson v. United States*, 331 F.3d 1294, 1298 (11th Cir. 2003). A "mere scintilla of evidence" is not legally sufficient. *Harper v.*

---

*Center v. Hicks*, 509 U.S. 502, 510-11 (1993). Yet the Supreme Court has also suggested that the third and ultimate stage of the burden-shifting analysis assumes that a prima facie case has been shown. The Court explained that, at the third stage, "[t]he factfinder's disbelief of the reasons put forward by the defendant . . . may, together with the elements of the prima facie case, suffice to show intentional discrimination." *Id.* at 511. Accordingly, evidence of a prima facie case appears to remain important throughout a case to the ultimate question of whether there is any legally sufficient evidentiary basis for a reasonable jury to find discrimination.

[5]    Under Eleventh Circuit law, it appears that a defendant's Rule 50(a) Motion is the last time that a court can address whether a plaintiff has presented legally sufficient evidence of a similarly situated employee. Courts may not revisit whether a plaintiff has made out a prima facie case after a case has been submitted to the jury. *See Collado v. United Parcel Service, Co.,* 419 F.3d 1143, 1153 (11th Cir. 2005) (stating that the "don't-look-back rule" "prevents us, as well as district courts, from looking into the existence of a prima facie case after the Rule 50(a) stage."). *But see Abel v. Dubberly*, 210 F.3d 1334 (affirming district court's granting of Rule 50(b) motion in defendant's favor on ground, among others, that plaintiff "did not offer any evidence sufficient to show that she was similarly situated to any other employee, and absent some other similarly situated but differently disciplined worker, there can be no disparate treatment").

BDDB01 4876064v1

*Se. Alabama Med. Ctr.*, 998 F.Supp. 1289, 1299 (M.D. Ala. Feb. 11, 1998) citing *Walker v. NationsBank of Florida N.A,*, 53 F.3d 1548, 1555 (11th Cir. 1995); *See also Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1244 (11th Cir. 1999). For example, the plaintiff in *Doe v. Lee*, 220 F.Supp.2d 1307, (M.D. Ala. Sept. 9, 2002) offered statements of co-conspirators as the basis for her claims. Though the plaintiff presented some evidence, the Court found that defendants would be entitled to judgment as a matter of law under Rule 50 because no reasonable jury could render a verdict in favor of plaintiff on any of her claims based on the weak hearsay evidence she presented. *Id.* at 1313.

### 3.    Judgment As Matter Of Law In Title VII Cases

Courts regularly grant motions for judgment as a matter of law where a plaintiff has failed during trial to offer legally sufficient evidence to support her Title VII claims. For example, in *Forrest v. Transit Mgmt. of Charlotte Inc.*, 2007 WL 2348698 (4th Cir. 2007), the plaintiff failed to offer evidence at trial of an employee who was "similarly situated" to him and thus "failed to demonstrate he was treated differently from an employee outside of the protected class who engaged in misconduct comparable in seriousness." *Id.* at *2. The District Court thus granted of judgment as a matter of law in favor of the defendants, and the Court of Appeals affirmed. *Id.* at *2. *See also Abel v. Dubberly*, 210 F.3d 1334 (11th Cir. 2000) (affirming granting of judgment as a matter of law in defendant's favor where plaintiff failed to present evidence of a similarly situated employee and ruling that "absent some other similarly situated but differently disciplined worker, there can be no disparate treatment"); *Johnson v. The Bd. of Trustees of the Univ. of Alabama*, 191 Fed. Appx. 838 (11th Cir. 2006) (affirming District Court's grant of

judgment as a matter of law on ground that plaintiff failed to prove a prima facie case for disparate treatment, and even if he had, the appellees proffered a legitimate, non-discriminatory reason and plaintiff could not show it was pretext for racial discrimination); *Brackett v. Alabama Dept. of Transp.,* 212 Fed. Appx. 779 (11th Cir. 2006) (Court concluded that the plaintiff did not carry her burden in showing pretext because none of the witnesses and none of the documents introduced at trial even hinted at the notion that the plaintiff was not promoted because she was African-American); *Butler v. Greif Bros. Serv. Corp.*, 2007 WL 1244206 (11th Cir. 2007) (finding plaintiff failed to establish a prima facie element of his case, that he had a disability under the ADA, and therefore, affirming District Court grant of judgment as a matter of law in favor of defendant); *Lopez v. Martinez*, 2007 WL 2012602 (5th Cir. 2007) (concluding plaintiff had failed to provide the facts necessary for a prima facie case for any of his claims and granting defendant's motion for judgment as a matter of law).

### C.    Ms. Foreman Did Not Offer Evidence Of A Male Or White Employee Who Had Engaged In "Nearly Identical" Misconduct

To establish the third prong of her prima facie case, Ms. Foreman bore the burden of demonstrating that she was "treated differently than a similarly situated employee outside of . . . her protect class." *Wright*, 2006 WL 905336, at *8.

In the Eleventh Circuit, a plaintiff is similarly situated to another employee for purposes of establishing her prima facie case of discriminatory discharge only if "the quantity and quality of the comparator's misconduct [are] nearly identical." *Burke-Fowler v. Orange County, Fla*., 447 F.3d 1319, 1323 (11th Cir. 2006). *See also Nix v.*

*WLCY Radio/Rahall Comm.*, 738 F.2d 1181, 1184-1185 (11th Cir. 1984) (a plaintiff alleging discriminatory discharge must show that the misconduct for which he was fired was "nearly identical" to conduct engaged in by an employee outside the protected class, who was retained by the employer); *Davin v. Delta Air Lines, Inc.*, 678 F.2d 567, 570 (5th Cir. 1982) (plaintiff must establish that the misconduct for which she was fired was "nearly identical" to that committed by a person outside her protected class who was retained).

As another Court in this District has explained, a "similarly situated" employee for purposes of workplace discipline is one who

> engaged in the same conduct <u>without</u> <u>such</u> <u>differentiating</u> <u>or</u> <u>mitigating</u> <u>circumstances</u> <u>that</u> <u>would</u> <u>distinguish</u> <u>their</u> <u>conduct</u> <u>or</u> <u>the</u> <u>employer's</u> <u>treatment</u> <u>of</u> <u>them</u> <u>for</u> <u>it.</u>

*Wright*, 2006 WL 905336, at *8 (internal citations omitted).

The purpose of requiring "nearly identical" misconduct is to avoid allowing courts and juries to engage in the mere second guessing of employers' good faith application of their personnel policies and procedures. *See Burke-Fowler*, 447 F.3d at 1323 ("When making that determination, '[w]e require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.'"); *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999) (same). This avoidance of second-guessing is necessary because an employer "may believe, without violating Title VII, that there is a qualitative difference between various acts of misconduct." *Wright*, 2006 WL 905336, at *8 (citation omitted). *See also Jones v. Bessemer Carraway Medical Center*, 137 F.3d

11

1306, 1311, *modified on other grounds*, 151 F.3d 1321 (11th Cir. 1998) ("Title VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules."). Thus, where a plaintiff and her proposed comparators are *not* similarly situated – that is, they have not engaged in "nearly identical" misconduct – then "an employer's decision to impose different punishment on each does not raise an inference of illegal discrimination." *Id.*

    1.    Ms. Foreman Was Required To Offer Evidence Of A Similarly Situated Male Employee Even Though Her Stated Reason For Her Departure From Work Without Notice Related To Menstruation

During arguments following the close of MBCI's case, Ms. Foreman's counsel appeared to suggest that Ms. Foreman, in support of her sex discrimination claim, could not offer evidence of a male employee who had engaged in "nearly identical" misconduct as required by the Eleventh Circuit because men do not menstruate.[6] Plaintiff's counsel has not offered any authority to suggest that the "nearly identical" misconduct standard does not apply to Ms. Foreman simply because she alleged that her misconduct related to her experiencing "female problems." Indeed, Plaintiff's counsel appears to be confusing the issue.[7] Ms. Foreman's burden in making out a prima facie

---

[6]   It bears noting that Ms. Foreman has not alleged nor has she offered any direct evidence of sex discrimination in this case. In particular, she has not alleged, nor did she offer any evidence, that any supervisor indicated that her employment was being terminated because her absence related to menstrual issues. To the contrary, every document and all of the testimony from trial indicated Ms. Foreman was terminated because she failed to provide any notice of her leaving work either before or after her departure from work and was gone for an extended period of time, which are gender-neutral reasons.

[7]   Taken to its logical conclusion, Plaintiff's counsel's argument would suggest that, since a "female issue" is unique to females, there can never be male comparators and therefore no summary judgment or Rule 50(a) motions would be justified under any circumstances in a case involving allegations of "female issues." Under such an analysis, allegations of "female problems" would become a trump card that is not contemplated under Title VII.

case is not to identify a male employee who engaged in misconduct for the same alleged reason, but to identify a male employee who engaged in the same misconduct. Here, that same misconduct would be a male employee's leaving work in the midst of his shift without notice and remaining missing during core production hours for an excessive period of time. *See, e.g.*, *Jirak v. Federal Express Corp.*, 805 F. Supp 193, 195 (S.D.N.Y. 1992) (mere fact that plaintiff gave as an excuse for her absence from work that she was suffering from menstrual cramps did not alleviate her of burden of showing similarly situated male employee with a high number of absences who had been treated differently under employer's absence policy).

Case law is clear that the mere fact that Ms. Foreman's stated reason for her misconduct related to menstruation does not free her from the obligation to identify a male employee who engaged in nearly identical misconduct. In *Shaw v. West Point Pepperell, Inc.*, 1985 WL 2208 (E.D.N.C. May 28, 1985), for example, the court granted judgment in favor of the defendant under almost the exact same circumstances alleged here by Ms. Foreman. (Case attached.) In *Shaw*, the plaintiff left her position working on an assembly line after she began her menstrual cycle. The plaintiff alleged that she had soiled her clothing and gone home to change her clothes. Because the plaintiff left without informing her supervisor, she was thereafter terminated for having abandoned her job without notice. The court granted judgment in favor of the defendant because she "failed to present any evidence that any other employee, male or female, had ever departed under similar circumstances without being similarly discharged." *Id.* at *3.

13

Regardless of Ms. Foreman's stated reason for her unannounced departure from her job, it was her obligation to support her prima facie case by providing evidence of a male employee who had similarly abandoned his position in the midst of his shift without notice, had been absent for an extended period of time, and had not been discharged as a result. Ms. Foreman failed to present any such evidence.

      2.      Ms. Foreman Was Not Similarly Situated To Mr. Clack Because <u>Mr. Clack Left At the End Of His Shift After His Job Was Done</u>

The testimony at trial showed that Mr. Clack worked on a DMR crew that stayed late to clean up after the rest of the employees on a shift had gone home for the day. On May 16, 2005, Mr. Clack left at the end of the day – after working for 11.4 hours – after the shift was completed and after the production lines had been shut down. At the time he left, his DMR work was done. However, because he failed to notify his Team Leader prior to leaving the facility, MBCI demoted Mr. Clack. The demotion resulted in a decrease in pay and low of opportunity to move into a management position with the company.

The evidence at trial showed that, unlike Mr. Clack, Ms. Foreman left during core production hours while the production lines were running and the cabinets were being assembled. Moreover, unlike Mr. Clack, when Ms. Foreman left the plant, her job for the day had not been finished. Indeed, Ms, Foreman's job went <u>undone</u> for over two hours in the middle of the day, from about 9 a.m. when she left until sometime after 11 a.m. when her supervisors discovered she was missing.

BDDB01 4876064v1

a.    Leaving Without Notice In The Middle Of A Shift
When Work Is Ongoing Is Not "Nearly Identical"
To All Other Types Of Absence-Related Conduct

Case law demonstrates that leaving in the middle of a shift without notice

while work is ongoing is a distinct type of misconduct for purposes of establishing a

prima facie case of discrimination.

In *Holston*, for example, the plaintiff was responsible for packing the

employer's products into boxes to be shipped, and she was stationed along a conveyor

belt in her employer's facility. (Case attached.) The court summarized the facts as

follows:

> On June 30, 1998, plaintiff began her shift as usual at 7:30 a.m., but
> by mid-morning, she began to suffer from intense vaginal itching
> related to a recurrent yeast infection. Plaintiff wanted to leave work
> to see her doctor, and contends that she searched for Wolfson [who
> was plaintiff's immediate supervisor], but could not find her.
> Accordingly, she left a note for Wolfson on her desk that stated:
> "Gayle, I'm too hot! Had to leave. Schawanda." Plaintiff did not
> include more specific details about her medical condition because
> Wolfson's desk was in an open area and plaintiff wanted to keep her
> condition private. . . . Plaintiff then clocked out at around 11:00 a.m.

*Id.* at 1322. After the plaintiff was determined to be gone from work, Wolfson reported

the plaintiff's absence to her own supervisor, Rodney Littlejohn.

> Littlejohn subsequently interviewed all the lead persons and
> supervisors in plaintiff's work area to determine whether plaintiff
> had notified any of them that she was leaving work early. It is
> undisputed that every lead person and supervisor . . . to whom
> Littlejohn spoke told him that plaintiff had not notified them that she
> was leaving work early.

*Id.* at 1323. After consulting with the company's human resources department, Littlejohn

decided plaintiff's employment should be terminated. The next morning when the

plaintiff returned to work, Littlejohn informed her that her employment "was being terminated for job abandonment." *Id.*

In an effort to make out a prima facie case of race discrimination, the plaintiff in *Holston* alleged that a white employee had failed to show up to work at all but had not been fired until she had missed three consecutive days, while plaintiff had been fired immediately for having left work in the middle of her shift without notice. Rejecting this argument, the court concluded that the white employee had not engaged in "nearly identical" misconduct because the defendant viewed the misconduct of an employee who abandoned her job in the middle of a shift "as a more serious threat to the orderly work of the plant" than the misconduct of an employee who does not show up to work at all. *Id.* at 1328. The evidence showed that the employer believed that when an employee abandons her job in the middle of her shift without notifying a supervisor, "it could result in a work flow stoppage and backlog that could decrease productivity," while an employee's failure to appear for work at all was less disruptive because the employer could make adjustments in the work flow at the beginning of the day. *Id.*

Similarly, in *McCalister v. Hillsborough County Sheriff*, the plaintiff police officer admitted that he had abandoned his post for a little over an hour to drive home, change his clothes, and meet with a female acquaintance. 2006 WL 3741883 (11th Cir. Dec. 20, 2006). After an investigation into his conduct by his employer, it was determined his employment should be terminated for abandoning his post and for breaking five other rules relating to this incident. The plaintiff sued, alleging his termination had been based on race.

16

The District Court in *McCalister* granted summary judgment in favor of defendant, and the Eleventh Circuit affirmed, concluding that none of the comparators identified by the plaintiff had engaged in "nearly identical" misconduct. For example, the Court explained that the plaintiff was not similarly situated to one employee who had been reprimanded for "Failure to Report For Duty Due To Improper Conduct" after he had missed work due to a motorcycle crash that had been his own fault. The Court concluded this incident was not "nearly identical" to the plaintiff's misconduct, stating:

> a failure to report for duty is not materially identical to departing one's post mid-shift for a tryst, leaving military personnel and property unguarded, lying to another officer about it, and then submitting a false document requesting payment for the trouble.

2006 WL 3741883, at *3.

As these cases demonstrate, Ms. Foreman, in order to meet the "nearly identical" misconduct requirement, is required to identify a male and/or white employee who left work in the same circumstances that she did.

       b.    There Is No Legally Sufficient Basis
               To Infer Sex or Race Discrimination Based
               On MBCI's Different Treatment Of Mr. Clack

Mr. Clack did not engage in misconduct that was "nearly identical" to that Ms. Foreman engaged in, and therefore Mr. Clack and Ms. Foreman were not similarly situated. Because Ms. Foreman thus failed to establish a prima facie case of discrimination based on Mr. Clack, there would be no legally sufficient evidentiary basis for the jury to find she had experienced discrimination on the basis of her sex or her race.

3.    Ms. Foreman Was Not Similarly Situated To Mr. Nazworth
Because Mr. Nazworth Informed His Team Leader Before
He Left Work And Provided A Doctor's Note When He Returned

The evidence at trial showed that Mr. Nazworth left his position _after_ informing his team leader that he was leaving.  Although the evidence suggested that Mr. Nazworth's team leader was upset with Mr. Nazworth for his departure, there was no dispute that the team leader had been informed of it before Mr. Nazworth left.  Moreover, the evidence also showed that Mr. Nazworth left from work to seek treatment from a doctor and that when he returned to work, he brought with him a doctor's note stating that he was excused from work due to his medical condition.  Mr. Nazworth's leaving work was therefore not treated by MBCI as misconduct.

As noted above, employees are similarly situated only if engaged in the "same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  _Wright_, 2006 WL 905336, at *8 (internal citations omitted).  Under this standard, Mr. Nazworth's conduct and Ms. Foreman's is not similar for purposes of giving rise to an inference of discrimination.  Mr. Nazworth informed his supervisor of his leaving; Ms. Foreman did not.  Mr. Nazworth returned with a doctor's note stating he had a medical condition that required his absence from work for a certain amount of time; Ms. Foreman did not.

Accordingly, Ms. Foreman failed to establish a prima facie case of discrimination based on Mr. Nazworth.

**B.**    **Ms. Foreman Did Not Offer Legally Sufficient Evidence Of Pretext**

Ms. Foreman failed to offer any legally sufficient evidentiary basis for a reasonable jury to find that MBCI's legitimate, non-discriminatory reasons for her termination – her leaving her job without notice and being gone for almost her entire shift – were mere pretexts for discrimination on either the basis of her sex or race.

1.    Ms. Foreman Did Not Meet The High Burden Where Decision Makers Were In Her Own Protected Class With Respect To Race

When, as here, decision makers are in the same protected class as the plaintiff, "the employee faces a more difficult burden in establishing that a discriminatory animus played a role in the decision complained about." *Holston*, 136 F. Supp. 2d at 1335. *See also Walker v. Boys and Girls Club of America*, 38 F.Supp. 2d 1326, 1337 (M.D. Ala. 1999) (in holding plaintiff failed to make out a prima facie case of discrimination, the court observed that it is "extremely difficult for a plaintiff to establish discrimination where the allegedly discriminatory decision-makers are within the same protected class as the plaintiff.").

Ms. Foreman presented absolutely no evidence to meet this very heavy burden with respect to her race discrimination claim. As noted above, the facts established at trial showed that Mr. Zellars and Mr. Smith – both of whom are African-American – were involved in the discovery of, investigation of, and assessment of Ms. Foreman's departure and absence from work without notice for an extended period of time. Both Mr. Zellars and Mr. Smith concurred in the decision to terminate Ms. Forman's employment under the circumstances. Furthermore, Mr. Zellars – as the

General Manager of the facility – was the highest-ranking member of management in the plant and served as the ultimate supervisor of all of the other decision makers, including Mr. Barthel and Mr. Krogh.  Indeed, Mr. Zellars spoke directly with Ms. Foreman the day after her termination and investigated the circumstances of her failure to provide any notice by personally interviewing employees in her work area to determine if any of them had been told by Ms. Foreman that she was leaving work.  He could find no one whom she had told of her departure, either before she had left or during her absence by telephone.  Mr. Zellars had the authority to reverse the decision to terminate Ms. Foreman's employment if he felt the decision had been wrong.  However, because he agreed with the decision, he did not exercise that authority.

> 2.    Ms. Foreman's Attempts To Second-Guess MBCI's
> Personnel Decisions Do Not Constitute Evidence Of Pretext

"Federal courts 'do not sit as a super-personnel department that reexamines an entity's business decisions.'"  *Brown v. Marriott International, Inc.*, 2006 WL 2189695, at *12 (N.D. Ga. 2006) (quoting *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999)).  Under the guise of attempting to show "pretext", that is exactly what Ms. Foreman is inviting this Court and this jury to do in this case.

According to her Trial Brief, Ms. Foreman apparently intended to establish pretext by attempting to show that MBCI had violated its own internal procedures.  However, there was no evidence that MBCI had "violated" any of its internal employment procedures.  Indeed, the vast majority of Ms. Foreman's evidence at trial

constituted nothing more than an attempt to second-guess MBCI's reasonable interpretation and application of its employment handbook.

The cases cited by Ms. Foreman demonstrate the groundlessness of her "pretext" argument. In *Brown*, 2006 WL 2189695 (N.D. Ga. 2006), for example, the court <u>refused</u> to find pretext based on the employer's alleged deviation from its hiring procedures. First, although the plaintiff argued that the employer's personnel policy should have been interpreted in a particular way, the Court found the evidence did not necessarily establish any policy violation. *Id.* at *15. Furthermore, even if there had been a deviation from policy, the Court held that fact alone was insufficient to show pretext. The court explained that "[a]bsent other evidence, deviation from a company policy [alone] does not demonstrate discriminatory animus." *Id. Cf. Bass v. Board of County Commissioners, Orange County, Florida*, 256 F.3d 10951108, 1109. (11th Cir. 2001) (finding that "other facts surrounding the interview process used in selecting the Training Instructors indicate that the process was suspect" and that there was other evidence of the defendant's "race-conscious hiring and promotion efforts").

Here there was no evidence of any deviation from policy. As noted above, Ms. Foreman did not establish a "violation" of policy through evidence showing that a similarly situated employee had been treated differently under the policy. Nor did she present any evidence that MBCI conceded there had been a violation of its internal procedures. *See, e.g.*, *Morrison v. Booth*, 763 F.2d 1366, 1373 (11th Cir. 1985) (noting that defendant "concedes that Putnam's reemployment violated state procedures"). Certainly, mere arguments by Ms. Foreman's own counsel in favor of alternative

21

interpretations of a handbook do not demonstrate any policy violation by MBCI.  Not a single witness testified that any MBCI procedures had not been followed.

Indeed, Ms. Foreman's suggestion that an employee conduct policy must be a set of inflexible rules in order to avoid an inference that it is discriminatory is not supported by any authority.  Indeed, such a proposition would be extraordinarily impractical and unrealistic.  For example, a workplace policy has to be flexible enough to address both the employee who merely walks away from an assembly line for an unauthorized break on the premises and the employee who abandons her job by leaving the facility without notice for the better part of a work day.  Although both employees may have committed the infraction of leaving their jobs without informing their team leaders, a degree of flexibility in addressing these different situations due to the different magnitude of the infractions does not equate to a "deviation" from internal procedures.  An employer's handbook has to be a living document that really is a guideline for both employees and managers and simply cannot be treated as a black and white, all encompassing menu of discipline.  Indeed, if such a comprehensive document could be drafted, there would be no need for human resources departments.

Finally, it is significant that MBCI has maintained consistently – from the day of Ms. Foreman's termination until the close of evidence at trial – the same clearly articulated explanation for Ms. Foreman's termination based on its policies.  Simply because Plaintiff's counsel does not like the outcome of MBCI's interpretation of its internal policies and procedures does not mean they are deviations or discriminatory.

Notably, the evidence at trial showed that another employee – Lorenzo Beattes – left at the exact same time as Ms. Foreman and was <u>not</u> terminated or disciplined because he had informed Mr. Smith, his Team Leader, that he needed to leave due to an emergency.  This is further evidence that MBCI's legitimate, non-discriminatory reasons for Ms. Foreman's termination – her failure to notify anyone of her departure from work – was not pretextual but rather in good faith.  Significantly, Mr. Beattes is African-American and thus in Ms. Foreman's same protected class with respect to race.

Accordingly, Ms. Foreman failed to present any evidence of pretext.

## <u>CONCLUSION</u>

Because Ms. Foreman failed to offer a legally sufficient evidentiary basis of a prima facie case of discrimination or of pretext, her claims will fail as a matter of law. No reasonable jury could infer either sex or race discrimination motivated Ms. Foreman's termination.  Finally, Ms. Foreman offered no legally sufficient evidentiary basis for her claims for punitive damages.  As a result, Defendant's Rule 50(a) Motion should be granted on the entirety of Ms. Foreman's Complaint.

WHEREFORE, MasterBrand Cabinets, Inc., respectfully requests that its Rule 50(a) Motion be granted and for all other appropriate relief.

BDDB01 4876064v1

BAKER & DANIELS LLP

By: <u>s/Christopher C. Murray</u>
  Mark J. Romaniuk, (IN Bar #15255-49)
  Christopher C. Murray (IN Bar #26221-49)
   (both admitted *pro hac vice*)
  Attorneys for MasterBrand Cabinets, Inc.

300 North Meridian Street, Suite 2700
Indianapolis, Indiana 46204-1782
Telephone: (317) 237-0300
Facsimile: (317) 237-1000
mark.romaniuk@bakerd.com
christopher.murray@bakerd.com

CERTIFICATE OF SERVICE

I hereby certify that on September 9, 2007, the foregoing was filed electronically.

Notice of this filing will be sent to the following counsel of record by operation of the

Court's electronic filing system.

>David R. Arendall
>Allen D. Arnold
>ARENDALL & ASSOCIATES
>2018 Morris Avenue
>Birmingham, Alabama  35203

>s/Christopher C. Murray
>Christopher C. Murray

BAKER & DANIELS LLP
300 North Meridian Street, Suite 2700
Indianapolis, Indiana 46204-1782
Telephone: (317) 237-0300
Facsimile:  (317) 237-1000
mark.romaniuk@bakerd.com
christopher.murray@bakerd.com