UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| KIM FOREMAN, | ) | |
| | ) | |
| Plaintiff, | ) | CAUSE NO. 3:06-cv-449-MHT |
| | ) | |
| v. | ) | |
| | ) | |
| MASTERBRAND CABINETS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S BRIEF IN OPPOSITION TO
PLAINTIFF'S MOTION FOR EQUITABLE RELIEF**

Pursuant to this Court's Order dated September 27, 2007 (Doc. 78), Defendant, MasterBrand Cabinets, Inc. ("MBCI"), respectfully submits this brief in opposition to Plaintiff, Kim Foreman's ("Plaintiff's") Motion for Equitable Relief (Doc. 74).

Plaintiff is not entitled to further relief in this matter, consequently, her claim for equitable relief should be denied. Denying Plaintiff's request for an award of front pay for three years, allegedly totaling $54,649.92, is appropriate since Plaintiff has failed to offer any evidence that such an award is justified under the circumstances. In particular, Plaintiff has failed to demonstrate that she has yet to be "made whole." Plaintiff, for whatever reason, has voluntarily elected to remain underemployed. Assuming for the purposes of argument only that an award of front pay is appropriate, the Court should reject Plaintiff's proposed "front pay rate" of $700.32 per week. Plaintiff's proposal fails to reflect accurately what Plaintiff would have earned had she remained

employed by MBCI and it fails to account for Plaintiff's failure to mitigate her alleged prospective damages.

## I.  FACTS RELEVANT TO PLAINTIFF'S CLAIM FOR FRONT PAY

### A.  Plaintiff Worked Significant Overtime During Her Final Year At MBCI

Plaintiff was hired by MBCI and began work in its Assembly Department on July 24, 2000. (Declaration of Kim Couch ("Couch Decl.") ¶4 (attached hereto as Exhibit 1).) Plaintiff worked primarily as an Expeditor within the Assembly Department although she could be assigned to other jobs within her job classification within the department. (Couch Decl. ¶4.)

Over the course of her employment with MBCI, Plaintiff's compensation on an annualized basis fluctuated, depending on the amount of overtime that was required of employees in her department. (Couch Decl. ¶6.)  Plaintiff's Forms W-2 show that she received annual compensation from MBCI of $29,044.49 in 2002, $29,240.30 in 2003, $35,980.41 in 2004, and $10,592.95 for January through April 13, 2005. (Couch Decl. ¶6 & Couch Exh. A.)

Plaintiff's annualized compensation from MBCI increased substantially in 2004 and 2005 due to the fact that during this time period employees in the Assembly Department were working significant overtime. (Couch Decl. ¶ 7.)  Over the final year of her employment, between April 2004 and April 2005, Plaintiff worked 610.20 hours of overtime at one-and-a-half times her regular rate of pay. (Couch Decl. ¶7.)

2

Plaintiff's employment with MBCI was terminated on April 13, 2005. (Couch Decl. ¶5.) At the time of her termination, Plaintiff's hourly rate of pay was $12.35. (Couch Decl. ¶5.)

### B. Overtime At MBCI Has Decreased Significantly Due To A Decline In Orders

Overtime in the Assembly Department and other departments at MBCI has declined substantially in 2006 and 2007 as MBCI's business has been impacted by the significant decline in new housing starts. (Couch Decl. ¶8.) During Plaintiff's final year of employment, between April 12, 2004 and April 12, 2005, employees in the Assembly Department worked a total of 22,954.88 hours of overtime. (Couch Decl. ¶8.) Between April 12, 2005 and April 12, 2006, employees in the Assembly Department only worked a total of 11,086.13 hours of overtime. (Couch Decl. ¶ 8.) Between April 12, 2006 and April 12, 2007, employees in the Assembly Department only worked a total of 7,183.97 hours of overtime. (Couch Decl. ¶8.)

Due to recent declines in the housing market and reduced demand for cabinetry, MBCI conducted a significant layoff of Auburn employees in September of 2007, reducing headcount by approximately 100 employees. (Couch Decl. ¶9.) Based on current business needs, MBCI's Human Resources Department does not anticipate that employees in MBCI's Assembly Department will be required to work any significant overtime into the foreseeable future. (Couch Decl. ¶9.)

After Plaintiff's employment was terminated another MBCI employee, Deborah Paradise, was assigned to fill Plaintiff's position within the Assembly

Department. (Couch Decl. ¶10; *see also* Def.'s Supplemental Answers Pl.'s 1st Interrogs. at 7-8 (relevant excerpts attached hereto as Exhibit 2.))  Like Plaintiff, Paradise was paid $12.35 per hour. (Couch Decl. ¶10.) Paradise has continued working in the Assembly Department from the time of Plaintiff's termination through the present. (Couch Decl. ¶10.) Paradise is paid the same hourly rate that Plaintiff would have been paid had she continued in her MBCI position. (Couch Decl. ¶10.) The amount of overtime worked by Paradise is generally representative of the overtime that Plaintiff would have had if she had remained employed in her Assembly Department position. (Couch Decl. ¶10.)

Consistent with the general decline in overtime worked by employees in the Assembly Department, Paradise has worked far less overtime than did Plaintiff during her final year of employment. (Couch Decl. ¶11.) Between April 12, 2005 and April 12, 2006, Paradise worked 173.4 hours of overtime. (Couch Decl. ¶11.) Between April 12, 2006 and April 12, 2007, Paradise worked only 25.00 hours of overtime. (Couch Decl. ¶11.)

Also consistent with the reduction in the amount of overtime available in the years since Plaintiff's termination, Paradise's annualized compensation is also lower than that received by Plaintiff during 2004 and 2005. (Couch Decl. ¶12.) Ms. Paradise's Form W-2 income for 2006 reflects that she earned total compensation of $26,478.40 from MBCI. (Couch Decl. ¶12 & Couch Decl. Exh. B.)

C.   **Subsequent To The Termination Of Plaintiff's Employment With MBCI, Plaintiff Obtained And Voluntarily Quit Two Jobs Paying More Than Her Current Job Pays**

Shortly after the termination of her employment with MBCI, Plaintiff, was hired by Capital Vial, Inc. on June 12, 2005, to work in its Auburn facility. (Declaration of Luanne Clayton ("Clayton Decl.") ¶4 (attached hereto as Exhibit 3).) Plaintiff's beginning pay at Capital Vial was $8.00 per hour, which later increased to $10.25 per hour. (Clayton Decl. ¶5; Pl.'s Answers 1st Set Interrogs. & Resps. 1st Set Req. For Produc. From Def. to Pl. ("Plaintiff's Answers"), at 7-8 (relevant excerpts attached hereto as Exhibit 4).) After working at Capitol Vial for approximately eight months, Plaintiff voluntarily resigned her employment effective February 28, 2006. (Clayton Decl. ¶6; Plaintiff's Answers at 8.)

The position held by Plaintiff at the time she resigned was the Mold Operator position, which is a Grade 2 position. (Clayton Decl. ¶4.) Plaintiff's working schedule as a Mold Operator was three twelve-hour shifts per week, plus one six-hour shift per week (hereafter, the "Twelve-Hour Shift Schedule"). (Clayton Decl. ¶9.) Because the twelve-hour days in this schedule include a 30-minute unpaid lunch period, the Twelve-Hour Shift Schedule results in a 40-hour workweek. (Clayton Decl. ¶9.) All Mold Operators work this Twelve-Hour Shift Schedule. (Clayton Decl. ¶9.)

There are other Grade 2 positions within Capitol Vial's Auburn facility that work a more traditional schedule of eight hours per day, five days per week. (Clayton Decl. ¶10.) These Grade 2 positions include Quality Control as well as positions within the warehouse. (Clayton Decl. ¶10.) When one of these positions becomes available, it

5

is posted, and current employees within the facility may bid for the job. (Clayton Decl. ¶10.) Plaintiff could have bid for open positions with more traditional work schedules. (Clayton Decl. ¶10.) All of the Grade 2 positions pay the same hourly rate as the Mold Operator position. (Clayton Decl. ¶10.)

Plaintiff was eligible to bid for a job transfer within Capitol Vial's Auburn facility. (Clayton Decl. ¶11.) Plaintiff could have also bid for a Grade 1 position. (Clayton Decl. ¶13.) The comparable hourly rate of pay for a Grade 1 position is $9.75, or .50¢ per hour less than a Grade 2 position. (Clayton Decl. ¶13.) There are significantly more Grade 1 than Grade 2 positions. (Clayton Decl. ¶13.) It is not uncommon for employees who do not like working the Twelve-Hour Shift Schedule to bid for a Grade 1 position to obtain a transfer to a more traditional eight hours per day, five days per week schedule. (Clayton Decl. ¶13.) The employee can then later bid for a Grade 2 position when it becomes available which has a more traditional work schedule in order to return to the higher level of pay. The ability to bid again is subject to the rule that an employee who transfers to a new position must wait six months before bidding for another transfer. (Clayton Decl. ¶13.) This certainly would have been an option available to Plaintiff. (Clayton Decl. ¶12.)

At trial, Plaintiff testified that the only reason she had resigned her employment with Capitol Vial was due to baby-sitting issues relating to her working the Twelve-Hour Shift Schedule associated with the Mold Operator position. However, prior to her voluntary resignation, Plaintiff did not bid on any Grade 1 or Grade 2 positions at Capitol Vial that had a more traditional work schedule, nor did she speak with Capitol

6

Vial's Human Resources Manager or her direct supervisor about problems raised by her schedule or about the possibility of transferring to another position with a different work schedule. (Clayton Decl. ¶¶10-16.)

If Plaintiff had maintained her employment as a Mold Operator through today's date, her current rate of pay at Capitol Vial would be $11.30 per hour. (Clayton Decl. ¶8.)[1]

After leaving Capitol Vial, Plaintiff became employed by WPH-Martex in Valley, Alabama as a Hemmer. (Pl.'s Answers at 8.) Her starting wage at WPH-Martex was $8.00 per hour, over $2.00 per hour less than her last wage had been at Capitol Vial. (*Id.*) She remained employed at WPH-Martex until October 30, 2006. (*Id.*) At the time her employment ended, Plaintiff's pay had increased to $9.11 per hour. (*Id.*)

In October 2006, Plaintiff became employed at SCA in Auburn, Alabama as an assembler. (*Id.*) Her starting pay at SCA was $7.50 per hour – almost $3 less per hour than her last rate at Capitol Vial and $1.61 less per hour that her last rate at WPH-Martex. (*Id.*) Plaintiff's rate at SCA had increased to $8.00 per hour by May, 2007. (*Id.*) Plaintiff's current pay at SCA has further increased to $8.75 per hour, which is still $1.50 per hour less than her pay had been at Capitol Vial a year-and-a-half earlier. (Pl.'s Mot. For Equitable Relief at 4 n.1.)

---

[1] Should the Court conclude that it would be helpful to have documents from Capitol Vial relating to Plaintiff's employment and resignation, MBCI respectfully proposes that it be granted leave to serve a subpoena on Capitol Vial seeking the production of such documents. Ms. Clayton of Capitol Vial has indicated to MBCI's counsel that the company will make Plaintiff's personnel file available for inspection and copying in response to a subpoena. (Clayton Decl. ¶ 17.)

   D.   **Lorenzo Betties Found A New Job Paying More Than He Had Earned At MBCI Within A Short Time Following The Termination Of His MBCI Employment**

Lorenzo Betties, Plaintiff's husband, was also employed by MBCI. (Couch Decl. ¶13.) Betties' employment was terminated by MBCI effective June 23, 2005. (Couch Decl. ¶13.) At the time of his termination, Betties was paid $12.60 per hour. (Couch Decl. ¶13.) Betties testified at trial that, following his termination by MBCI, he was hired by Hyundai to work in its Alabama plant, where he is paid substantially more than his former hourly rate at MBCI. According to his testimony at trial, Betties continues to work at Hyundai and is currently paid over $20 per hour.

## II.   ARGUMENT

The "basic purpose of Title VII relief is to 'make whole' victims of unlawful discrimination." *Nord v. United States Steel Corp.*, 758 F.2d 1462, 1470 (11th Cir. 1985). In the Eleventh Circuit, successful Title VII plaintiffs are presumptively entitled to either reinstatement or front pay. *U.S.E.E.O.C. v. W&O, Inc.*, 213 F.3d 600, 619 (11th Cir. 2000).

However, a front pay award should "not confer a windfall." *Armstrong v. Charlotte County Board of County Commissions*, 273 F.Supp.2d 1312, 1317 (M.D. Fla. 2003) (internal quotation marks and citation omitted). "Front pay, therefore, is appropriate only when the other damages awarded will not fully compensate the plaintiff for his injury." *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1529 (11th Cir. 1991).

Where front pay is awarded, it is to be "calculated to end on the date the discrimination victim attains the position she would have been in but for the

discrimination." *Armstrong*, 273 F.Supp.2d at 1317. *See also James v. Stockham Valves Fittings Co.*, 559 F.2d 310, 358 (5th Cir. 1977) (holding that front pay should be limited to the date a victim of discrimination attains an opportunity to move to his or her "rightful place").

In addition, a Title VII plaintiff who alleges unlawful termination "is required to mitigate damages by being reasonably diligent in seeking employment substantially equivalent to the position she or he lost." *Nord*, 758 F.2d at 1470 (citing *Ford Motor Company v. Equal Employment Opportunity Commission*, 458 U.S. 219 (1982)). Therefore, a court, "in the exercise of its duty to render an equitable award of damages for front pay, must . . . consider what is fair and reasonable under the circumstances," including the plaintiff's efforts at mitigation. *Armstrong,* 273 F.Supp.2d at 1317.

As set forth below, the Court should deny Plaintiff's request for an award of front pay because Plaintiff has failed to demonstrate that she has yet to be "made whole." Alternatively, if front pay is awarded, the Court should reject Plaintiff's proposed "front pay rate" of $700.32 per week because it fails to reflect accurately what Plaintiff would have earned had she remained employed by MBCI and fails to account for Plaintiff's failure to mitigate her alleged prospective damages.

 A. **<u>Plaintiff Has Not Offered Evidence To Support Her Claim For Front Pay</u>**

The trial in this case occurred in early September 2007, approximately two-and-a-half years after Plaintiff's employment was terminated by MBCI in April 2005.

9

The jury awarded Plaintiff back pay based on Plaintiff's calculations of what she would have earned between her termination and trial. Accordingly, Plaintiff has already been compensated with damages covering two-and-a-half years following her termination (subject to certain mitigation earnings).

### 1. **Plaintiff Has Already Been Made Whole**

Plaintiff has not presented any evidence that the significant amount of back pay already awarded to her is insufficient to make her whole. Where a plaintiff utterly fails to support a demand for front pay with evidence of continued injury – as has Plaintiff in this case – a court should deny her motion for such relief. For example, in *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515 (11th Cir. 1991), the 11th Circuit vacated the district court's award of three years of front pay. Noting that the district court had already awarded the plaintiff back pay for several years up to 1988, the 11th Circuit explained that "[t]he district court did not state any reason why, within the period beginning in September, 1985, and ending in 1988, [the plaintiff] should not have been able to work his way up from management trainee to a supervisory position." *Id*. at 1529. The 11th Circuit thus concluded, "we see no reason to award him front pay in addition." *Id*. See also *E.E.O.C. v. Domino's Pizza, Inc.*, 909 F.Supp. 1529, 1537 (M.D. Fla. 1995), aff'd 113 F.3d 1249 (11th Cir. 1997) (finding that "[n]o award of front pay nor a reinstatement requirement is necessary to complete the make whole remedy" because "[b]ack pay is sufficient to fully compensate Plaintiff for the injury he suffered as a result of Defendant's conduct.").

Here, Plaintiff has failed to offer any evidence to demonstrate why, after two-and-a-half years, she is still unable to attain a position equal to that she was in at the time of her termination. In particular, she has not claimed, let alone demonstrated, that she must "work her way" up over the course of several years in any subsequent job before she can achieve pay, responsibilities, and/or benefits equal to those she received as an MBCI Expeditor. Notably, Plaintiff did not have to "work her way up" at MBCI to become an Expeditor at MBCI. (Couch Decl ¶4.) In addition, Plaintiff has not offered any evidence about the benefits or opportunities associated with her former position at MBCI that she claims her current position (or any other possibly available position) lacks. *Cf. Briscoe v. Fred's Dollar Store, Inc.*, 822 F.Supp. 1353, 1361 (E.D. Ark. 1993), aff'd 24 F.2d 1026 (8th Cir. 1994) (refusing the award front pay because the record was deficient of basic facts such as "the number of hours she work[ed] per week").

The only basis that Plaintiff offers for comparing her present position with that which she occupied at the time of her termination is her rate of pay. Plaintiff asserts that she is presently paid an hourly rate of $8.75 per hour (*See* Pl.'s Mot. at 4 n.1.) Prior to her termination, Plaintiff was paid $12.35 per hour by MBCI. (Couch Decl. ¶5.) However, Plaintiff has not offered evidence to show that the gap between her current pay and her MBCI pay is attributable to discrimination by MBCI as opposed to her own free choice.

To the contrary, Plaintiff's discovery responses indicate that within only a few months of Plaintiff's termination by MBCI, she had already obtained a job with Capitol Vial paying her $10.25 per hour, nearly what she had been paid at MBCI after

11

five years of employment.  (Pl.'s Answers at 7-8.)   In addition, the evidence at trial regarding Plaintiff's husband, Lorenzo Betties, demonstrated that he was able to find a job paying significantly *more* than his former position at MBCI within a very short time after his termination in June 2005.  There is no evidence that, with appropriate diligence, Plaintiff could not have – like her husband – obtained and retained a position at least equal to that which she held at MBCI in the time that has already passed since her employment at MBCI was terminated.

### 2.     **Plaintiff Has Failed To Mitigate Her Damages**

Plaintiff's discovery responses further indicate that Plaintiff voluntarily left this higher paying job for her current, lesser paying position.  Plaintiff's voluntary departure from this higher paying job constitutes a failure to mitigate her damages for which MBCI should not be held responsible by awarding Plaintiff front pay.

It is well established that "[t]he duty to mitigate damages by seeking employment elsewhere will, ..., limit the amount of front pay available." *Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1562 (11th Cir. 1988) (emphasis added) (citation omitted).  A plaintiff's duty to mitigate includes the obligation to make "'reasonable and good faith efforts' to *retain* [subsequent] job[s]." *See Sennello v. Reserve Life Ins. Co*. 667 F.Supp. 1498, 1513 (S.D. Fla. 1987) aff'd 872 F.2d 392 (11th Cir. 1989) (quoting *Brady v. Thurston Motor Lines,* 753 F.2d 1269, 1277 (4th Cir. 1985) (emphasis added). Thus courts have recognized that "'a claimant who voluntarily quits comparable, interim employment fails to exercise reasonable diligence in the mitigation of damages'" and, as such, damages must be "decreased by the amount [s]he would have earned had [s]he not

12

quit.' " *Id*. (quoting *Brady*, 753 F.2d at 1277 and 1273) (other citations omitted); *see also Barbour v. Medlantic Management Corp.*, 952 F.Supp. 857, 864 (D.D.C.), *aff'd without pub'd opinion*, 132 F.3d 1480 (D.C.Cir.1997) ("By voluntarily quitting suitable employment for personal reasons, [plaintiff] failed to exercise reasonable diligence."). A plaintiff can avoid a reduction in her front pay due to her voluntarily quitting a subsequent job only if she had "'compelling or justifying reasons' for having quit the job." *Sennello*, 667 F.Supp. at 1514.

   Here, Plaintiff did not offer any evidence that she had a compelling or justifying reason for quitting her job at Capital Vial. The only explanation that Plaintiff provided was vague testimony at trial that she had quit because of babysitting issues. As an initial matter, case law establishes that this is not a sufficient reason to quit a job for purposes of avoiding a reduction in any award due to her breach of her duty to mitigate. *See, e.g.*, *Reiner v. Family Ford, Inc.*, 146 F.Supp.2d 1279, 1288 (M.D. Fla. 2001) (finding that plaintiff's "child care issues" did not a provide a compelling or justifying reason for her voluntarily quitting comparable employment and thus the plaintiff did "not exercise reasonable diligence in mitigating her damages through maintaining interim employment").

   Moreover, the evidence shows that Plaintiff made absolutely no effort to transfer to another position at Capitol Vial with a different work schedule, even though there was a process available to her for doing so. (*See* Clayton Decl. ¶¶10-16 & Clayton Exh. A.) There are other Grade 2 positions at Capitol Vial that have more traditional work schedules than the Twelve-Hour Shift Schedule of the Mold Operator Position.

13

(Clayton Decl. ¶10.)  These positions would have paid the same as the Mold Operator position.  (Clayton Decl. ¶10.)  In addition, Plaintiff could have transferred to a Grade 1 position with a more traditional work schedule and slightly less pay.  (Clayton Decl. ¶13.)  However, Plaintiff never spoke with the human resources department about moving to another position or to her supervisor.  She simply quit.  In place of her Capitol Vial job, she accepted a lower paying position, voluntarily abandoning a job that paid $10.25 per hour (and <u>currently</u> <u>pays</u> <u>$11.30</u> <u>per</u> <u>hour</u>) to take instead a job that paid $8.00 per hour at WPH-Martex.  (Clayton Decl. ¶8; Pl.'s Answers at 8.)  Even if Plaintiff had taken a Grade 1 position at Capitol Vial, she would still have been paid $9.75 per hour, well above the $8.00 hour pay rate she accepted at WPH-Martex.  (Clayton Decl. ¶13; Pl.'s Answers at 8.)[2]

Accordingly, Plaintiff's voluntarily quitting a job that paid her $10.25 per hour in 2005 (and may have paid her even more by now, two years later) breached her duty to mitigate her damages.  Plaintiff cannot now reasonably claim she is entitled to an award of front pay from MBCI based on the difference in pay between her current job and former job at MBCI where Plaintiff voluntarily chose to accept this lower paying position in lieu of at least one other, higher paying one.

---

[2] The fact that Plaintiff's husband had by this time obtained a significantly higher paying job at Hyundai than he had held previously may have created circumstances in which Plaintiff was willing to accept voluntarily a self-imposed cut in pay by quitting her job at Capitol Vial.  Clearly, MBCI cannot be held liable for any loss in pay that Plaintiff voluntarily assumed because the financial circumstances of her household had otherwise improved.

### 3. Plaintiff's Stated Preference For Her Current Job Demonstrates That She Does Not Consider The Loss Of Her Employment At MBCI To Be A Continuing Injury

Even with the wage gap between her current job and her former position at MBCI, it is clear that Plaintiff does not believe that the loss of her employment at MBCI continues to cause her injury.  It is highly significant that Plaintiff did not even request reinstatement in her Motion For Equitable Relief.  Plaintiff's counsel has made explicit that Plaintiff believes her current employment – despite a somewhat lower hourly rate than her former MBCI position – is preferable to employment by MBCI because she regards it as more secure.  By letter dated October 5, 2007, Plaintiff's counsel stated that "At present, Ms. Foreman's current employment is not subject to a reduction in force or closure.  Continued employment in this economic climate is much more promising in her current job position." (Letter dated 10/5/07, attached hereto as Exhibit 5.)

Plaintiff's preference for her current job over her former position at MBCI demonstrates that she has already been made whole and does not suffer any present injury based on the termination of her MBCI employment.

### 4. Plaintiff Has Failed To Offer Any Evidence To Support An Award Of Front Pay For Three Years

Plaintiff offers absolutely no evidence with respect to the duration of her requested award of front pay.  Plaintiff seeks an award of three more years of pay based solely on Plaintiff's counsel's bald contentions that this additional amount of time will "allow her to 'catch-up' on her hourly rate" and that "[i]t is reasonable to believe that it will take at least that much longer to achieve that hourly rate again." (Pl.'s Mot. at 4.)  Plaintiff's motion does not cite any evidence to support these assertions, not even

testimony or an affidavit from Plaintiff herself.  The request in Plaintiff's Motion for three more years of pay is evidently pulled from thin air.

As noted above, Plaintiff's husband, Lorenzo Betties, testified at trial that he is now employed in an automotive assembly plant and receives pay <u>higher</u> than his former wage at MBCI.  Betties' employment was terminated two months after Plaintiff's employment was terminated, yet Betties has been able to place himself in a position at least equal to that he occupied at MBCI.  Plaintiff provides no explanation for why, unlike her husband, it will take her a total of five-and-a-half years to "catch up" to where she had been at MBCI.

Courts routinely reject plaintiffs' requests for extensive periods of front pay that lack any evidentiary basis.  For example, like Plaintiff here, the plaintiff in *Goss v. Exxon Office Systems Co.* failed to support her request for an award of three years of front pay.  747 F.2d 885 (3d Cir. 1984)  In rejecting her claim, the district court explained:

> I am asked to award front pay through the end of 1987 on the basis of plaintiff's conclusory statement that it will take her that long to reach her rightful place by staying with her current employer. No foundation was laid in the evidence for this statement. For all I know, the number was based on sheer guesswork.

*Id.* at 890 (3d Cir. 1984) (quoting district court opinion).  Exercising its discretion, the court instead awarded the plaintiff four months' of front pay, and the Third Circuit affirmed.  *Id.  See also Hipp v. Liberty Nat'l Life Ins. Co.*, 39 F.Supp.2d 1359, 1364 (M.D. Fla. 1999) (declining to award any front pay because plaintiffs failed to present evidence to support their claims, and the court refused to engage in speculation); *Ward v. Tipton County Sheriff Dep't*, 937 F. Supp. 791, 799 (S.D. Ind. 1996) (awarding plaintiff only

four months of front pay to cover the time period between trial and the court's order on equitable relief where plaintiff did not demonstrate that she "continue[d] to suffer the sting of discrimination, or that she continue[d] to use reasonable diligence in her search for comparable employment").

As noted above, the end date for an award of front pay is "the date the discrimination victim attains the position she would have been in but for the discrimination." *Armstrong*, 273 F.Supp.2d at 1317. *See also McKnight v. General Motors Corp.*, 973 F.2d 1366, 1371 (7th Cir. 1992) ("Damages should ordinarily extend only to the date upon which 'the sting' of any discriminatory conduct has ended."). MBCI respectfully submits that this date has already passed, that the award of back pay Plaintiff received at trial has fully compensated her and made her whole, and that no award of front pay is warranted.

  B. **<u>Plaintiff's Front Pay Calculations Are Incorrect</u>**

Even if the Court were to conclude that front pay were an appropriate remedy, the Court should reject Plaintiff's proposed award, which is based on improper and misleading calculations. Plaintiff has proposed a "front pay rate" of $700.32 per week, evidently suggesting that this is the amount she would have earned at MBCI had her employment not been terminated. (Pl.'s Mot. at 4.) Plaintiff has not offered any evidence to support this figure.

Indeed, Plaintiff's $700-per-week figure is refuted by the evidence. This proposed amount is based solely on the last year and four months of Plaintiff's employment at MBCI, when the Auburn facility was requiring employees to work an

17

unusually high amount of overtime. (Couch Decl. ¶¶7-8.) The extraordinary amount of overtime that Plaintiff (and other Auburn employees) worked in 2004 was reduced in 2005 and 2006. (Couch Decl. ¶8.) In fact, due to recent declines in the housing market and reduced demand for cabinetry, MBCI conducted a significant layoff of approximately 100 Auburn employees in September of 2007. (Couch Decl. ¶9.)

If Plaintiff had remained employed with MBCI beyond April 2005, her overtime hours and her pay would have decreased from the highs they hit in 2004. This fact is demonstrated by the pay records for Deborah Paradise, who was another employee in the Assembly Department who is paid the same as Plaintiff would have been paid had she remained in her Assembly Department position. The amount of overtime worked by Paradise is generally representative of the amount of overtime that Plaintiff would have worked had she remained employed at MBCI in the Assembly Department. (Couch Decl. ¶10.) In 2006, for example, Paradise earned total compensation from MBCI of $26,478.40 which equals $509.20 per week. (Couch Decl. 12 & Couch Exh. B.) It is this figure that is an accurate representation of what Plaintiff would have earned had her employment with MBCI not been terminated.

As noted above, Plaintiff voluntarily terminated her employment with Capitol Vial. If she had maintained her employment as a Mold Operator through today's date, her current rate of pay at Capitol Vial would be $11.30 per hour. Because Plaintiff had a duty to mitigate her damages by retaining this position, it is this higher hourly rate – rather than her current rate of $8.75 per hour (*see* Pl.'s Mot. at 4 n.3.) – that should be

18

used to calculate the amount of Plaintiff's mitigation offset. At 40 hours per week, Plaintiff's weekly pay at Capitol Vial would have been $452.

The difference between Paradise's average weekly pay (*i.e.*, the true amount Plaintiff would have earned had she remained employed by MBCI) and Plaintiff's Capital Vial pay is $57.20 per week ($509.20 - $410). Accordingly any award of front pay should be calculated based upon this amount.[3] For example, an award of one year of front pay would equal $2,974.40 ($57.20 * 52).

WHEREFORE, MBCI respectfully requests that Plaintiff's Motion For Equitable Relief be denied. Alternatively, should Plaintiff be awarded front pay, MBCI respectfully requests that the amount of that award be calculated as set forth above, based on Deborah Paradise's average weekly earnings and Plaintiff's earnings from Capitol Vial, and that the period of front pay extend no longer than from the date of trial through the date of this court's order granting such relief.[4]

---

[3] If Plaintiff's current pay were used as the basis for a front pay award, it would be approximately $350 per week. Plaintiff states that she is presently earning $8.75 per hour and working 40-hour weeks. (See Pl.'s Mot. at 4 n.3.) In that case, the difference between Paradise's pay and Plaintiff's would be approximately $159.20 per week ($509.20 - $350). A one-year award of front pay would thus equal $8,278.40.

[4] MBCI further notes that the figures used in Plaintiff's proposed prejudgment interest calculation are not correct. With the correct figures, this calculation would be $44,501.48 * .0427 * 2.41 years, or $4,579.51.


Respectfully submitted,

BAKER & DANIELS LLP

By: s/ Christopher C. Murray
    Mark J. Romaniuk, (IN Bar #15255-49)
    Christopher C. Murray (IN Bar #26221-49)
    (both admitted *pro hac vice*)
    Attorneys for MasterBrand Cabinets, Inc.

300 North Meridian Street, Suite 2700
Indianapolis, Indiana 46204-1782
Telephone: (317) 237-0300
Facsimile: (317) 237-1000
mark.romaniuk@bakerd.com
christopher.murray@bakerd.com

CERTIFICATE OF SERVICE

I hereby certify that on October 18, 2007, the foregoing was filed electronically. Notice of this filing will be sent to the following counsel of record by operation of the Court's electronic filing system.

    David R. Arendall
    Allen D. Arnold
    Stephanie S. Woodard
    ARENDALL & ASSOCIATES
    2018 Morris Avenue
    Birmingham, Alabama 35203

    s/Christopher C. Murray
    Christopher C. Murray

BAKER & DANIELS LLP
300 North Meridian Street, Suite 2700
Indianapolis, Indiana 46204-1782
Telephone: (317) 237-0300
Facsimile: (317) 237-1000
christopher.murray@bakerd.com